2004 OK CIV APP 53

Floyd TWYMAN, Joyce Twyman, and Alan Twyman, Plaintiffs/Appellees/Counter–Appellants,

v.

The GHK CORPORATION, Mobil Oil Corporation, and Does I–V, Defendants/Third–Party Plaintiffs/Appellants Counter–Appellees,

v.

Schlumberger Technology Corporation and Baker Hughes Companies, Inc. d/b/a Baker Atlas, Third–Party Defendants.

Nos. 98,426, 98,434, 98,445.

Court of Civil Appeals of Oklahoma, Division No. 3.

Jan. 23, 2004.

Rehearing Denied March 26, 2004.

Certiorari Denied June 7, 2004.

Arthur W. Schmidt, Stephen M. Morris, Deena R. Tyler, Mahaffey & Gore, P.C.,

Oklahoma City, OK, for The GHK Corporation.

Gary W. Davis, Harvey D. Ellis, L. Mark Walker, Crowe & Dunlevy, Oklahoma City, OK, for Mobil Oil Corporation.

Patricia A. Kirch, Ardmore, David P. Hartwell, Oklahoma City, Cregg Webb, Shawnee, Scott McCardle, Edmond, OK, for Floyd Twyman, Joyce Twyman, and Alan Twyman.

Opinion by CAROL M. HANSEN, Judge.

¶1 In this action alleging "toxic contamination" of the Plaintiffs' Twyman dairy farm by oilfield operations under the control of Appellants/Counter–Appellees, GHK Corporation (GHK) and Mobil Oil Corporation (Mobil), GHK and Mobil appeal from trial court judgment in favor of Appellees/Counter–Appellants Floyd, Joyce and Alan Twyman (hereafter collectively Twymans). Twymans counter-appeal from the trial court's order granting remittitur of the jury's award.

¶2 GHK and Mobil conducted oilfield operations on and adjacent to Twymans' property, on which Twymans operated a dairy farm with approximately 170 cows. Beginning in 1995, some of Twymans' cows experienced health problems and some of those died.[1] They made efforts to determine the cause of the problems, but when the problems continued, Twymans disposed of the remainder of the herd.

¶3 Then, in 1998, Twymans filed suit against GHK and Mobil, claiming pollutants migrated from their oilfield "reserve pits", located on adjoining land, and contaminated the Twyman farm's water well. Twymans further alleged this contamination caused them to lose their dairy herd and rendered their entire farm worthless. Twymans sued for negligence, nuisance and deceit.

¶4 The case was tried to a jury. Because of the nature of the claims, the parties introduced testimony of a number of expert witnesses on the question of causation. That evidence was and remains the central issue in this case. The jury returned a general verdict damage award for plaintiffs in the amount of $7,250,000.00 on the claims of neg-

---

1. The exact number of cows that died is unclear from the record, but apparently 19–20 at most, and some of those admittedly died from causes unrelated to this suit.

ligence and nuisance. No punitive damages were awarded. The jury apportioned negligence liability between GHK and Mobil at 19% and 81%, respectively. The jury found in favor of GHK and Mobil on the deceit claim and on Twymans' negligence claim of damages from a radioactive "logging tool" which allegedly had been lost in a drilling hole during oilfield operations.[2]

¶5 GHK and Mobil moved, alternatively, for judgment notwithstanding the verdict, new trial, or remittitur of actual damages to $250,000.00. The trial court's order on the alternative motions sets forth the court's rationale as to each motion in some detail. The trial court denied the motions for judgment notwithstanding the verdict and for new trial, finding that while Twymans' "case on liability hung by a thread", they "put on sufficient evidence of causation for the case to go to the jury."

¶6 The trial court did, however, order remittitur of actual damages to $950,000.00. In doing so, the court found the award of $7,250,000.00 was "undoubtedly outrageous, and beyond all measure unreasonable", and that the "award manifestly shows it was actuated by passion, prejudice, or partiality." The court further found, "giving [Twymans] every benefit of the doubt", the maximum damages to the land was $250,000.00, Twymans' own estimate, and the maximum value for the loss of the *entire* dairy herd was $200,000.00. Recognizing the award for nuisance was the "wild card" as far as determining damages,[3] the trial court found $500,000.00 was a reasonable award.

¶7 The parties now appeal from the trial court's order on the post-judgment motions and the underlying judgment. GHK

and Mobil, in separate but substantively similar briefs, first argue they were entitled to judgment notwithstanding the verdict because the trial court erred in admitting expert scientific testimony on causation[4] which failed to meet the reliability standards of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)(hereafter *Daubert*). *Daubert* was adopted for application in Oklahoma state court civil actions by *Christian v. Gray*, 2003 OK 10, 65 P.3d 591 (hereafter *Christian*).[5]

¶8 While the crux of the arguments by GHK and Mobil is that the lack of *reliable* and admissible expert evidence results in a fatal deficiency of evidence to prove their oilfield activities caused Twymans' injuries, a threshold question is what evidentiary rule applies. Twymans assert the *Daubert* standards should not be applied here because trial was concluded in 2002, before *Christian* adopted *Daubert* for use in Oklahoma civil actions. We find *Daubert* should be applied retrospectively.

¶9 *Christian* does not address either prospective or retrospective application of *Daubert*, nor have our appellate courts subsequently decided that question. We then look to our sister courts for guidance. The Louisiana Court of Appeals determined *Daubert* should be applied retroactively in *Young v. Logue*, 660 So.2d 32 (La.Ct.App. 4th Cir. 1995), a case with facts very similar to those here.[6] Louisiana's basic rule of evidence respecting expert testimony tracks Federal Rule of Evidence 702, as does ours—12 O.S. 2001 § 2702 (hereafter § 2702).

¶10 Louisiana adopted *Daubert* in *State v. Foret*, 628 So.2d 1116 (La.1993). *Daubert*

---

**2.** The jury's finding on the "logging tool" claim mooted the third-party claims. The third-party defendants are not party to this appeal.

**3.** Recovery under a nuisance theory may be for, *inter alia*, such intangibles as inconvenience, annoyance and discomfort. *Thompson v. Andover Oil Co.*, 1984 OK CIV APP 51, 691 P.2d 77.

**4.** Causation is a necessary element in proving both negligence and nuisance actions. *See, Mason v. State ex rel. Bd. of Regents of University of Oklahoma*, 2001 OK CIV APP 33, 23 P.3d 964

(negligence) and *Thompson v. Andover Oil Co.*, note 3, *Supra* (nuisance).

**5.** *Daubert* was adopted for use in Oklahoma state court criminal cases in *Taylor v. State*, 1995 OK CR 10, 889 P.2d 319.

**6.** *See also, State v. Coon*, 974 P.2d 386 (Alaska 1999)(Prohibition on *ex post facto* legislation does not bar retroactive application of *Daubert*, a judicial decision, and further, "changes to rules governing the admissibility of evidence do not violate [the prohibition on *ex post facto* laws].")

was decided before the trial in *Young, Foret* was decided after. As noted above, that is the same sequence as here, except here it was *Christian* which was decided after trial. The *Young* Court held *Daubert* must nonetheless be applied retroactively because *Daubert* and *Foret* announce a *procedural* rule of law. The *Christian* Court likewise found whether *Daubert* applied to civil actions was a new *procedural* question. *Christian,* 65 P.3d at 596, note 4.

¶ 11 The one distinction in *Young* and the case before us is that Louisiana statutorily provides that "[p]rocedural and interpretive laws apply both prospectively and retroactively, unless there is a legislative expression to the contrary." La.C.C. art. 6. This distinction does not, however, distinguish *Young* for persuasive effect because Oklahoma has, by common law, adopted a similar rule.

¶ 12 In *Cox v. Brockway, Inc. (N.Y.),* 1985 OK 80, 708 P.2d 1085, the Oklahoma Supreme Court approved retroactive application of a federal statute of limitation determined controlling by the United States Supreme Court in *DelCostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). In the absence of an express statutory limitation period applicable to "section 301(a) of the Labor Management Relations Act", the *DelCostello* Court adopted an analogous limitation period from "section 10(b) of the National Labor Relations Act." The *DelCostello* Court retroactively applied the limitation period to the cases before it.

¶ 13 The Court in *Cox,* at 1088, noted that "whether and to what extent a new rule shall be given retroactive effect is [a question] of judicial policy", and that "retroactive application of a newly announced rule is the traditional common law approach, rather than the exception." The Court further noted that in

considering arguments against retroactive application, the court should consider (a) the novelty of the rule, (b) the purpose of the rule and whether it will be furthered by retroactive application, and (c) possible inequities from retroactive application.

¶ 14 As to novelty, adoption of the *Daubert* standards in *Christian* was not, as expressed in *Cox,* a "bolt out of the blue." *Daubert* was decided almost ten years before trial here and its possible adoption in the various states has been discussed widely during that period.[7] The Oklahoma Court of Criminal Appeals, considering the same evidentiary statutes now before us, mandated use of *Daubert* for novel scientific evidence in state court criminal matters in 1995[8], and has reexamined its holding in a number of cases.[9] In *Cities Service Co. v. Gulf Oil Corp.,* 1999 OK 14, 980 P.2d 116, the Oklahoma Supreme Court, although not adopting *Daubert* standards, cited *Daubert* positively by footnote for the responsibility of trial courts as "the 'gatekeeper' of the evidentiary process to screen evidence, i.e., to determine its relevance and reliability."

¶ 15 In *Christian,* the court noted:

... a trial judge's decision to prevent improper testimony from an expert witness is not new to our jurisprudence. (citation omitted) Our Evidence Code currently recognizes the gatekeeping capacity of a trial judge, and *Daubert* is but a refinement of this role. *Christian,* at 598.

Nothing in *Daubert* or *Kumho*[10] conflicts with our Evidence Code. *Christian,* at 600.

¶ 16 In *Daubert,* the Court observed that the previously used "general-acceptance" test for admissibility of novel scientific evidence, set forth in *Frye v. United States,* 54 App. D.C. 46, 47, 293 F. 1013 (1923), had been displaced by the Federal Rules of Evidence. *Christian,* 65 P.3d at 597. The purpose of

---

7.   See, *Christian,* at 594, note 2, for an extensive list of cases in which various states have considered adoption of *Daubert.*

8.   See, note 5, supra.

9.   See, e.g. *Gilson v. State,* 2000 OK CR 14, 8 P.3d 883; *Young v. State,* 1998 OK CR 62, 992 P.2d 332; and *Wood v. State,* 1998 OK CR 19, 959 P.2d 1.

10.   *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), "held that *Daubert's* general principles apply to all expert matters described in Federal Rule 702, that is, 'scientific, technical or other specialized knowledge'." *Hurlbut v. Morrow,* 2002 OK CIV APP 83, 55 P.3d 455.

*Daubert* was to establish a framework in which the trial courts could, under the Federal Rules of Evidence, "ensure that any and all scientific testimony or evidence admitted is not only relevant, but must be 'scientific' and reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786.

¶ 17 In *Christian*, at 612, the Oklahoma Supreme Court determined *Daubert* would be the evidentiary standard in the matter before it and remanded it to the trial court to allow the parties to present evidence in support of and in opposition to the reliability of the offered expert evidence. As the Court noted in *Cox v. Brockway, Inc. (N.Y.)*, 708 P.2d at 1088, referring to the *DelCostello* Court, "implicit in the Court's application of the rule to the cases before it for decision [is] that this purpose is furthered by retroactive application." The need for scientifically reliable expert evidence in accordance with § 2702 justifies retroactive application of *Daubert* and *Christian* here.

¶ 18 We do not believe inequities will result from retroactive application of *Daubert* and *Christian*. GHK and Mobil argued applicability of *Daubert* at all appropriate stages in the trial court. Twymans argued for the *Frye* standard, but addressed *Daubert* and the related evidence in support of its expert witnesses meeting the *Daubert* standards. In fact, because the trial court did not specify what standard it used in ruling on the admissibility of Twymans' experts, we cannot be certain the trial court did not apply Daubert.[11]

¶ 19 Further, as to possible inequities, the *Frye* general acceptance standard, which Twymans asserted to be applicable, has been found to be less "flexible" than the standards set in *Daubert. See, Taylor v. State*, 889 P.2d at 329.[12] Under *Frye*, "novel" scientific evidence could be admitted only if the uncommon procedure or theory about which the expert planned to testify was "sufficiently established to have gained general acceptance in the particular field in which it belongs." *Id.*, at 327. General acceptance is only one of the indicia of reliability under *Daubert*, none of which are deemed definitive. Lastly, as to this point, Twymans have not shown here how the contested expert testimony would satisfy the *Frye* general acceptance test, if that is the evidentiary standard which they still propound.

¶ 20 The Oklahoma Court of Criminal Appeals, in *Romano v. State*, 1995 OK CR 74, 909 P.2d 92, declined to retroactively apply *Daubert* "to scientific subjects previously accepted as valid for expert testimony." *Also see, e.g., Hanson v. State*, 2003 OK CR 12, 72 P.3d 40. However, that Court determined in *Taylor v. State*, 889 P.2d at 329, it would adopt *Daubert* for *novel* scientific evidence. *Christian*, 65 P.3d at 599. Scientific subjects previously accepted as valid would not be novel, therefore, there would be no need for *Daubert* scrutiny. The Court of Criminal Appeals has not decided if it would apply *Daubert* retroactively to novel scientific evidence. Additionally, there is no showing the controverted evidence here was previously accepted as valid.

¶ 21 Having found *Daubert* to be applicable, we must determine if the expert testimony in controversy satisfies its dictates. Expert evidence was necessary to assist the trier of fact here. The central issue was whether Twymans' alleged losses resulted from contamination of their water well by oilfield operations under the control of GHK and Mobil. The determination can be made only through data derived from several disparate scientific disciplines and is beyond the ability of the average juror without the aid of those knowledgeable in those disciplines.[13] The *Christian* Court, 65 P.3d at 601, citing

---

11. *See, Hurlbert v. Morrow*, note 10, supra (Even before adoption of *Daubert* for mandatory application in Oklahoma state civil cases, there were no general constraints on trial courts looking to *Daubert* for guidance in determining admissibility of expert witnesses pursuant to § 2702.)

12. *See also, e.g. State v. Coon*, note 6, supra (*Frye* is potentially capricious because it excludes scientifically reliable evidence which is not yet generally accepted, and admits scientifically unreliable evidence which although generally accepted, cannot meet rigorous scientific scrutiny.)

13. Twymans alone used experts from the fields of, among others, veterinary medicine, radiation toxicology and biology, chemistry, petroleum engineering, geology, hydrology and environmental engineering.

*Matchen v. McGahey*, 1969 OK 48, 455 P.2d 52, held:

> When an injury is of a nature requiring a skilled and professional person to determine cause and the extent thereof, the scientific question presented must necessarily be determined by testimony of skilled and professional persons.

¶ 22 Finding expert evidence necessary, we must decide if the trial court acted properly here in allowing the jury to consider such evidence in reaching its verdict. We have set out above some of the legal parameters the U.S. Supreme Court established in *Daubert*. In *Christian*, the Oklahoma Supreme Court examined those *Daubert* parameters at length and restated some of the more prominent pronouncements for guidance.

¶ 23 The *Christian* Court, at 597, quoting *Daubert*, noted that "[i]n a case involving scientific evidence, evidentiary reliability will be based upon scientific validity." The Court provided this list of factors from *Daubert*, 509 U.S. at 593–594, 113 S.Ct. 2786 for trial courts to consider when determining admissibility:

1. Can the theory or technique be, or has it been, tested;

2. Has the theory or technique been subjected to peer review and publication;

3. Is there a "known or potential rate of error ... and the existence and maintenance of standards controlling the technique's operation"; and

4. Is there widespread acceptance of the theory or technique within the relevant scientific community.

¶ 24 *Christian*, 65 P.3d at 598, further noted the trial court's *Daubert* inquiry is a flexible one, focusing on evidentiary relevance and reliability underlying the proposed submission and not on the conclusions they generate. The trial court's inquiry:

> ... entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. *Daubert*, 509 U.S. at 592–593, 113 S.Ct. 2786.

¶ 25 Generally, the burden of showing evidence is admissible is on the party offering it. *Christian*, at 603, citing *Wofford v. Lewis*, 1962 OK 265, 377 P.2d 37. More specifically, the proponent of expert scientific testimony must satisfy the test for admissibility, *i.e.*, "must prove by a preponderance of the evidence that the testimony is reliable." *Christian*, 65 P.3d at 603, quoting *Moore v. Ashland Chem., Inc.*, 151 F.3d 269 (5th Cir.1998).

¶ 26 In reviewing a decision on the admissibility of expert evidence, we will apply the clear abuse of discretion standard. *Christian*, at 608. "In order to determine whether there was an abuse of discretion, a review of the facts and the law is essential." *Id.*, quoting *Board of Regents of University of Oklahoma v. National Collegiate Athletic Association*, 1977 OK 17, 561 P.2d 499. "An abuse of discretion occurs when a court bases its decision on an erroneous conclusion of law or where there is no rational basis in evidence for the ruling." *Christian*, 65 P.3d at 608. In either case, the question is one of law and will be reviewed *de novo*. *Id.*

¶ 27 Twymans utilized a number of expert scientific witnesses in attempting to prove their allegations that pollutants from oilfield operations controlled by GHK and Mobil caused their losses. Their general assertion was that heavy metals, hydrocarbons and radioactive materials migrated, from a well site on adjoining property, through geological subsurface fractures, and polluted their well. They further asserted the polluted water caused the health problems of their dairy cows, which eventually resulted in the loss of their dairy business.

¶ 28 GHK and Mobil do not concede their actions resulted in contamination of Twymans' well, nor that the well was contaminated at all, but rely primarily on their argument that Twymans' evidence as to proximate causation was fatally unreliable. We agree. While GHK and Mobil contest the entire evidentiary trail from well site to the cows' demise, we need only look to the evidence Twymans relied on to prove the well water was the cause of the cows' illness. Because this latter evidence was scientifically unreliable, and thus inadmissible under *Dau-*

*bert,* Twymans failed to prove the requisite element of proximate causation.[14]

¶ 29 Twymans' experts, relating to the question of how the well water may have affected their cows, were Howard Zent (Dr. Zent) and Norbert Page (Dr. Page), both veterinary doctors. Both opined Twymans' cows became sick because of the combined effects of components in the well water. Dr. Zent additionally testified that manganese in the water could have been responsible for the cows' illnesses. For the following reasons we find these theories without sufficient scientific basis to be reliable and therefore, in accordance with *Daubert* and *Christian,* should not have been presented to the jury.

¶ 30 Dr. Zent testified on cross-examination, "Well, we knew we didn't have anything above safe drinking water levels, so we felt it was a combination effect possibly, yes." The extended theory was that this combined effect of otherwise safe levels of heavy metals was toxic to the bacteria in the cows' digestive system, leading the cows to lose weight and develop other problems. Dr. Zent acknowledged heavy metals naturally exist in ground water and that low levels of these heavy metals do not equate to pollution.

¶ 31 Dr. Zent further acknowledged this particular theory of synergistic effect was developed in this case by "everyone working on this investigation." He stated it was not his theory and that he could not attribute it to any individual. Dr. Zent could not identify the specific heavy metals which he contended combined to have toxic effect, and conceded he was not trained in toxicity of heavy metals.

¶ 32 While not determinative, we look to the *Daubert* factors adopted by the *Christian* Court to consider when assessing scientific reliability. Dr. Zent was not aware of any scientific literature that supported the synergism theory with respect to the components involved and the effect on animals, and was also not aware of anyone else advancing such a theory. There is no evidence this theory

has been tested in any manner, nor does there appear to be any reason why it could not have been tested. There has been no peer review outside the body of Twymans' own experts. In that it is an entirely new theory, it obviously does not have general or widespread acceptance in the relevant scientific community.

¶ 33 Dr. Zent, who had been brought in by Twymans after their regular treating veterinarian could not determine the cause of the cows' problems, reached the conclusion that the cows' illness was caused by the combined effect of the well water's components by differential diagnoses, that is, by ruling out the likely causes "until the most probable one is isolated." *Christian,* 65 P.3d at 604. To rule out "dairy management", which Dr. Zent conceded was "the first thing you look at", he in turn sought the assistance of Dr. Dan Waldner, a Dairy Extension Specialist from Oklahoma State University, and an acknowledged dairy management expert.

¶ 34 Dr. Waldner visited Twymans' farm and provided them a written report concluding, among other things, that their feeding regimen was improper and could be causing the weight loss exhibited as the primary symptom by their cows. Dr. Zent admitted, however, he never saw the actual report until it was provided to him by GHK and Mobil during preparation for trial. He had relied on Twymans' oral representations that the report was positive. Thus, although he later said he disagreed with Dr. Waldner's conclusions, Dr. Zent did not have the benefit of the expert advice he had himself sought when formulating his theory. He failed to consider another possible cause for the cows' health problem when proceeding through the differential diagnosis. His diagnostic methodology was, therefore, at best, suspect.

¶ 35 *Christian,* at 605, citing *Hollander v. Sandoz Pharmaceuticals Corp.,* 289 F.3d 1193 (10th Cir.2002), states:

> . . . where differential diagnosis is used to show specific causation the party has also

14. Note 4, *supra.* The question of proximate cause is one of law for the court if no admissible evidence has been produced from which a jury could reasonably find a causal link between the alleged wrongful act and the injury. *Hampton by and Through Hampton v. Hammons,* 1987 OK 77, 743 P.2d 1053.

provided "independently reliable evidence that the allegedly dangerous drug or substance had harmful effects", i.e. general causation was also shown.

¶ 36 Similarly, *Christian*, 65 P.3d at 607, holds that:

> if expert testimony is necessary to show cause of an injury from exposure to a toxin, the testimony of the expert should reveal a reliable method for determining the quantity of the toxin necessary to cause injuries of the type experienced by plaintiff (general causation), unless plaintiff can show that the circumstances are such that general causation should not be necessary.

¶ 37 Dr. Zent provided no evidence as to how much of the purportedly polluted well water, or how much of the constituent elements of the combined heavy metals, would be required to cause the illness Twymans contend their cows suffered. There is no independently reliable evidence that the well water was harmful. Further, Twymans failed to show the circumstances did not require a showing of general causation. "An expert's opinion on causation must be more than *ipse dixit*." [15] *Christian*, at 607. The reliability of the method is not shown merely because the expert states that causation exists. *Id.*

¶ 38 Dr. Page's testimony by deposition was equally unsupportive of scientific reliability as to the synergism theory. Dr. Page also had expertise in radiation toxicology and included radioactivity in putting forth his theory of synergistic or combined effect. He was retained in 2000, after the herd was disposed of, and never visited Twymans' farm. He formulated his opinion on the records provided by Twymans.

¶ 39 Dr. Page testified he believed the affected cows "had a background instance of bovine leukemia virus." This condition is common in dairy herds at the "subclinical" stage, that is, "not actually a medical problem at the time." Dr. Page further testified he believed "something" caused the condition to become clinical as the result of immune system "suppression". On direct, he replied, "radiation is one possibility", but that it was "difficult to say if and how much radiation was present in the water that the cattle drank."

¶ 40 Dr. Page noted there were no analyses of the well water in 1996–97 that had any measurements for radiation. He went on to note the analyses he had seen were performed in 2000 or early 2001. Dr. Page concluded, "[s]o it's pure speculation as to what was present in the water that the cattle consumed in 1996 and 1997." Even when asked to assume the constituent levels were the same in 1996 and 1997 as in 2000,[16] he could only state "I think it's highly possible that there were enough of the three types of pollutants (radiation, hydrocarbons and heavy metals) to have caused some immune suppression."

¶ 41 In *Daubert*, on remand, the Ninth Circuit Court of Appeals held the trial court properly rejected "epidemiological evidence .. that Benedectin could *possibly* have caused plaintiffs' injuries." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1322 (9th Cir.1995)(Emphasis added). The Ninth Circuit Court of Appeals found the evidence lacking because it proffered a possibility rather than a probability. *Id.*[17] In a similar holding, our Court of Civil Appeals has noted, "[s]peculation is the antithesis of proximate cause." *Butler v. Oklahoma City Public School System*, 1994 OK CIV APP 22, 871 P.2d 444. In Dr. Page's theory, we have the uncertainty of *possible* causation based on the uncertainty of an unproven assumption. In the absence of some independently reliable evidence that the well water caused the

**15.** *Ipse dixit*—"He himself said it; a bare assertion resting on the authority of an individual." *Christian*, at 607, note 19, quoting *Black's Law Dictionary*, 961 (4th ed.1951).

**16.** We have not been directed to any evidence to support this assumption.

**17.** *Cf., Downs v. Longfellow Corporation,* 1960 OK 107, 351 P.2d 999 (It is fundamental that a plaintiff, in order to impose liability upon a defendant, is required to establish, by a preponderance of the evidence, that the defendant was guilty of negligence which probably, not merely possibly, caused plaintiff's injury).

harm, Dr. Page's opinion falls short of *Daubert's* admissibility standards.

¶ 42 Dr. Page's scientific evaluation additionally suffered from the same shortcoming as Dr. Zent in that he also failed to consider the alternative explanation for the cattle's illness set forth in Dr. Waldner's report on herd management. Dr. Page testified he had not seen the report, only a reference to it, and it was his "understanding that [Dr. Waldner] really didn't find any really poor management practices." Dr. Page acknowledged that if the report was not positive, "it would have to be a factor to consider along with the other information."

¶ 43 Dr. Page, who did not do independent research or testing of his synergistic theory, relied on "information ... derived from other animal studies or what we know from human effects." He did not identify animal studies, but did testify he based his opinion on studies of "various chemicals ... that may be given plus estrogen" which resulted in human breast cancer, and "[e]xposure to iron oxide dust and then radiation" resulting in human lung cancer. Dr. Page opined from these otherwise unidentified studies that "there's no reason to think there would not be a combined or synergistic effect."

¶ 44 By way of analogy, although with a reversal of species, the Third Circuit Court of Appeals has held, "in order for animal studies to be admissible to prove causation in humans, there must be good grounds to extrapolate from animals to humans, just as the methodology of the studies must constitute good grounds to reach conclusions about the animals themselves." *In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717 (3rd Cir.1994).[18]

¶ 45 Twymans provides no evidence that Dr. Page's extrapolation from human studies to animal illness is scientifically sound, particularly where the combination of substances in the human studies have not been shown to be in any way related to the substances he was considering as part of his combined effect theory. Also, Dr. Page offered nothing on the efficacy of the methodologies used in the human studies from which he extrapolated his own theory.

¶ 46 Dr. Zent testified, it appears at least to some degree alternatively to his combined effect theory, that Twymans' cows were harmed by manganese in the well water. During *voir dire* by GHK and Mobil, Dr. Zent stated "It's the reduced form of manganese that is toxic." The trial court ruled Dr. Zent could not testify as to *reduced* manganese because of an order granting a motion *in limine* and barring such testimony by another witness as a new theory.

¶ 47 Dr. Zent then testified that *oxidized* manganese was toxic at certain levels, but on cross-examination admitted that he did not know at what level oxidized manganese would be toxic to dairy cows. Dr. Zent acknowledged manganese is included as an essential element in dairy feed, and conceded it would be speculation to state the cows were getting more manganese from the water than the feed because "we don't know how much of that black sludge was being brought up at different times when it would build up on the [water well] pump."

¶ 48 The reliability of Dr. Zent's theory concerning possible detrimental effects of *oxidized* manganese is made problematic by his own statements on *voir dire* that it was *reduced*, not *oxidized* manganese which carried the toxic effect. Although he testified manganese in the Twymans' well water exceeded federal human drinking standards, he admitted he was unaware of the difference between primary and secondary standards and that the standard to which he was referring may have had nothing to do with health. Dr. Zent further admitted he had not identified any levels of oxidized manganese in Twymans' well that had been established to be harmful to dairy cows.

¶ 49 Dr. Zent had done no independent research or testing to support his manganese theory, nor did he establish there was widespread acceptance of such a theory. *Christian*, 65 P.3d at 599. He based his theory on

---

18. *See also, Rider v. Sandoz Pharmaceuticals Corporation*, 295 F.3d 1194 (11th Cir.2002)(It is necessary for plaintiffs to offer some rationale for the suggestion that the vascular structure of humans and animals are sufficiently similar ... to conclude that bromocriptine's effect on animals may be extrapolated to humans.)

a two-phase study done by others. The first phase of the study indicated increased dry oxidized manganese intake caused decreased cow weight at some undetermined level between 820 parts per million (ppm) and 2460 ppm. The second phase found that at the highest level tested, 3000 ppm, there was no adverse effect on the cows. The highest level found in Twymans' well water was 1.5 ppm. Dr. Zent had not determined the ppm of manganese in the feed Twymans' cows were getting, so he was unable to state with any scientific certainty that the water contained more manganese than the feed. Dr. Zent's theory of increased oxidized manganese intake seems to be little more than additional speculation in the absence of proof of a more definitive cause. We have noted above that "[s]peculation is the antithesis of proximate cause." *Butler v. Oklahoma City Public School System*, 871 P.2d at 446. Dr. Zent's theory does not meet the *Daubert* standards for scientific reliability and should not have been allowed in evidence.

▉▉▉▉ ¶ 50 In their Reply Brief Twymans assert this Court should restrict its review of the evidence relating to *Daubert* admissibility to that presented at the hearings on the motions *in limine*. We find no merit in this assertion. A motion *in limine* is a motion preliminary to trial to prevent introduction of prejudicial matters, and an order ruling on such motion is advisory until finally determined at trial. *Christian*, 65 P.3d at 610, note 22. The trial court did not rule finally on admissibility of testimony from Dr.'s Zent and Page until GHK and Mobil objected to their testimony at trial. The trial court could properly consider all matters in evidence at the time of trial objection, as can we on appeal. In fact, we are not aware of any rule precluding our consideration of any matter of record in determining admissibility under *Daubert*.

[18, 19] ¶ 51 The evidence in controversy from Dr.'s Zent and Page did not meet the *Daubert* reliability standards which *Christian* directs to be applied. Our review of the record reveals that without that evidence, Twymans fail to establish the requisite causal nexus between any action by GHK and Mobil and Twymans' losses. When there is no evidence from which the jury could reasonably find a causal nexus between the alleged negligent act and the resulting injury, it becomes a question of law for the court. *Christian*, at 610, quoting *McKellips v. Saint Francis Hosp., Inc.*, 1987 OK 69, 741 P.2d 467. A verdict will be directed for the defendants if plaintiffs fail to meet the burden of producing evidence that a reasonable person could believe in the existence of the causal link. *Id.*

¶ 52 Twymans have failed to adduce scientifically reliable and admissible evidence that their well's water caused them any harm. Therefore, they also failed in their burden to prove proximate causation, an essential element of the negligence and nuisance claims, the only claims remaining after the jury's verdict. Twymans have not appealed the jury's determination on their claims and the verdict is binding on them. The trial court erred in not granting GHK and Mobil judgment notwithstanding the verdict. Accordingly, the trial court's judgment is REVERSED. The trial court is directed to enter judgment in favor of GHK and Mobil. Twymans' appeal from the trial court's grant of remittitur is rendered MOOT.

¶ 53 REVERSED AND REMANDED with instructions.

JOPLIN, J., and MITCHELL, P.J., concur.