Samantha HALL, Plaintiff,

v.

CONOCOPHILLIPS, et al., Defendants.

NO. CIV–14–0670–HE

United States District Court,
W.D. Oklahoma.

Signed 03/31/2017

G. Steven Stidham, Lorinson Smith & Huffman PC, Deanna L. Hartley, Environmental Law Center, Jason B. Aamodt, Krystina E. Phillips, Aamodt Law Firm, Kalyn Cherie Free, Kalyn Free PC, Dallas L. Dale Strimple, Indian and Environmental Law Group PLLC, Tulsa, OK, David F. Askman, Michael M. Frandina, The Askman Law Firm LLC, Denver, CO, Keith E. Patton, Shrader & Associates, Houston, TX, Ryan J. Ellis, Trae Gray, Landowner-Firm PLLC, Coalgate, OK, for Plaintiff.

Brett J. Young, Pro Hac Vice, Norton Rose Fulbright LLP, Houston, TX, Lloyd W. Landreth, Robert J. Carlson, Scott R. Rowland, Gable & Gotwals, Tulsa, OK, for Defendants.

## ORDER

JOE HEATON, CHIEF U.S. DISTRICT JUDGE

Plaintiff Samantha Hall sued defendants Conoco Inc., ConocoPhillips Company, and Phillips 66,[1] alleging her exposure to benzene emitted from defendants' refinery (the "Refinery") in Ponca City, Oklahoma caused her to develop acute myelocytic leukemia (AML inv(16)).[2] Defendants moved to exclude the testimony of several of plaintiff's designated experts on Daubert[3] grounds and hearings were held regarding the admissibility of the testimony of Drs. David Mitchell, Steven Gore, Martyn Smith and Mary Calvey. This order addresses the proposed testimony of Drs. Mitchell, Gore and Calvey.

### Standards

The general standards for a Daubert challenge to expert testimony are well established. "In accord with Rule 702, the Supreme Court has determined that the [trial judge] 'must ensure that any and all scientific testimony or evidence is not only relevant, but reliable.'" Bitler v. A.O. Smith Corp., 400 F.3d 1227, 1232 (10th Cir. 2005) (quoting Daubert, 509 U.S. at 589, 113 S.Ct. 2786). This gatekeeper function applies to all expert testimony, not merely to that deemed to be "scientific" in nature. Kumho Tire Co. Ltd. v. Carmichael, 526 U.S. 137, 147–49, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Rule 702 provides:

1. Plaintiff also initially sued E.I. DuPont de Nemours and Company, but voluntarily dismissed it. See Doc. # 35. (References are to the CM/ECF Document number and CM/ECF page number.).

2. One of plaintiff's experts, Dr. Gore, explained that plaintiff "developed a myelomonocytic leukemia characterized by a specific chromosomal abnormality: namely, inversion of chromosome 16." Doc. # 94–9, p. 8, ¶ 13. The court will refer to plaintiff's leukemia as AML, unless the distinction matters.

3. Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

A witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

In deciding the admissibility of expert testimony, the court must determine whether the expert is proposing to testify to scientific or other specialized knowledge which will assist the trier of fact in understanding or determining a fact in issue. Daubert, 509 U.S. at 592, 113 S.Ct. 2786. The court first determines whether the proposed expert "is qualified by 'knowledge, skill, experience, training, or education' to render an opinion." United States v. Nacchio, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*) (quoting Fed. R.Evid. 702). Further, to be qualified, the expert's knowledge, skill, experience, training or education must be relevant to the facts or matters at issue. Ralston v. Smith & Nephew Richards Inc., 275 F.3d 965, 969 (10th Cir. 2001). The court then conducts a further two-part inquiry, determining first if the expert's proffered testimony has " 'a reliable basis in the knowledge and experience of his [or her] discipline.' " Bitler, 400 F.3d at 1233 (quoting Daubert, 509 U.S. at 592, 113 S.Ct. 2786). In making this determination, the district court must decide " 'whether the reasoning or methodology underlying the testimony is scientifically valid.' " *Id.* at 1233 (quoting Daubert, 509 U.S. at 592–93, 113 S.Ct. 2786). Second, the district court must inquire "into whether proposed testimony is sufficiently 'relevant to the task at hand.' " *Id.* at 1234 (quoting Daubert, 509 U.S. at 597, 113

S.Ct. 2786). In other words, is there an appropriate "fit" between the evidence offered and the material issue to which it is directed.

All of the challenged experts have strong credentials. The issues raised by defendants' Daubert motions for the most part relate to whether they have ventured outside their respective disciplines, or to the particular methodologies used in reaching their opinions, not to their qualifications.

■ Defendants raised a threshold objection with respect to supplemental declarations Drs. Mitchell and Gore prepared. The declarations were filed long after the deadline for identifying experts and submitting expert reports, after the experts had been deposed and after defendants had filed their Daubert motions. Defendants challenged the declarations in their Daubert reply briefs and at the Daubert hearings, claiming they contained new matter which should be stricken.

■ An expert may be permitted to supplement his or her report, for example to update information or to respond to challenges or issues raised during depositions. Here it went beyond what is normally allowed. Both Drs. Mitchell and Gore relied on information provided to plaintiff's counsel by Dr. Kenneth F. Ede, Ph.D., an environmental scientist. Because of Dr. Ede's statements, Dr. Mitchell made significant changes to the models he used to assess plaintiff's exposure to benzene, including a five-fold increase in the emission rate from the Refinery. As the extent of plaintiff's exposure to airborne benzene vapors is central to her claims, that change was significant. Dramatically different inputs to the model resulted in dramatically different outputs. Plaintiff contends that the recalculations were necessitated because defendants underre-

ported their fugitive emissions,[4] a fact which Dr. Mitchell stated he learned from Dr. Ede. *See* Doc. # 111–1, p. 6, ¶ 15.[5] However, information about discrepancies in defendants' emissions reporting was potentially available before Dr. Mitchell issued his report. During the Daubert hearing Dr. Mitchell testified about Exhibit 15, which contained information about defendants' benzene emissions. That document is dated February 4, 2010. Regardless, plaintiff did not designate Dr. Ede as an expert and defendants did not have the opportunity to question him. His letter to plaintiff's counsel, dated May 5, 2016, was submitted after the expert deadlines, after the discovery completion date of April 1, 2016, and after a strong challenge to the sufficiency of Dr. Mitchell's and Dr. Gore's first submissions had been made.

■ Counsel's suggestion that defendants could have redeposed plaintiff's experts is not a practical solution to the problem. That renders the court's scheduling order a virtual nullity, increases the cost of discovery and leaves the parties and court in a constantly shifting, never ending pattern of case preparation. A party may not use the pretext of supplementation to reopen discovery, close gaps in their evidence, and essentially generate new expert reports.

■ Plaintiff thus seeks to rely on evidence in violation of Fed.R.Civ.P. 26's standards, which the court can allow "only if the violation was justified or harmless." Jacobsen v. Deseret Book Co., 287 F.3d 936, 953 (10th Cir. 2002). Factors to consider when determining whether supplementation should be allowed include: " '(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness.' " *Id.* (quoting Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir.1999)). Here defendants clearly would be prejudiced if the supplementation is allowed because it "[w]ould necessitate an entire re-working of the case." Henderson v. Nat'l R.R. Passenger Corp., 412 Fed.Appx. 74, 82 (10th Cir. 2011). As for whether the defendants could cure the prejudice, " '[a]lthough enough time and money can cure almost any deficiency, the Court does not believe that perpetual litigation is what the Tenth Circuit ... meant by " 'cure.' " *Id.* If Drs. Mitchell and Gore were allowed to testify on the basis of their new declarations, the trial date, in a case that is already several years old, would have to be set back yet again. While the court does not find that the plaintiff or her counsel acted in bad faith, the fact that multiple supplemental declarations were filed and that at least two were based on the opinion of a newly hired expert, lead the court to conclude that plaintiff's litigation conduct was a significant deviation from the process contemplated by Rule 26. Having evaluated these four factors, the court concludes that plaintiff's Rule 26(a) violation was neither justi-

**4.** *Emissions from the plant are divided into two categories—stack and fugitive. Plaintiff relies on the modeled concentration results associated with the fugitive releases of benzene vapors because they exceeded those associated with the stack releases.*

**5.** *Dr. Ede's statements in his letter, based on his review of the literature and his having "spoken to USEPA relating to the estimation of*

*benzene emissions from refineries," was not definitive. See Doc. # 116–31, p. 2. He stated that "The literature (specifically EPA Docket No. EPA–HQ–OAR–2003–0146) reports that the benzene emission estimates for refineries similar to the PCR can be understated by at least 5 (five) times to 100 times higher than emissions calculated using AP–42 equations. It is therefore likely that the PCR benzene emissions are similarly understated." Id.*

fied nor harmless and that the declarations and testimony of Dr. Mitchell and Dr. Gore, to the extent they are based on information from Dr. Ede, should be stricken. *See id.* at pp. 80–82. The court will disregard the opinions of Drs. Mitchell and Gore insofar as they are based on information received from, or the opinions of, Dr. Ede.

To establish her toxic tort claims [6] plaintiff must prove not only that benzene can cause AML inv(16) (general causation), but that her exposure to benzene from defendants' refinery caused her to develop the disease (specific causation). *See* Norris v. Baxter Healthcare Corp., 397 F.3d 878, 881 (10th Cir. 2005) ("General causation is whether a substance is capable of causing a particular injury or condition in the general population and specific causation is whether a substance caused a particular individual's injury."). Plaintiff hired Dr. Mitchell to offer an opinion on the levels of benzene in the air surrounding the Refinery, Dr. Gore to testify that her "benzene dose" or her cumulative exposure to benzene from the Refinery was sufficient to and did cause her AML and Dr. Calvey to testify that benzene could and did cause her AML (inv16).[7]

### David Mitchell, Ph.D.

Dr. Mitchell, who has an undergraduate degree in physics and mathematics and a PhD in atmospheric science and meteorology, is a forensic meteorologist. He has been retained as an expert in about 350 cases in which he has done both forensic meteorology or weather event reconstruction, and air modeling, which he describes as dealing with "all types of situation[s] to determine downwind impact of material being released." Doc. # 154, p. 82. Plaintiff relies on Dr. Mitchell to testify "on the levels of benzene at ground level in the air in areas where Ms. Hall lived, played, and went to school." Doc. # 111, p. 1. To establish plaintiff's benzene exposure, Dr. Mitchell used an air dispersion model (AERMOD), which simulated stack and fugitive emissions [8] of Volative Organic Compounds (VOCs) and Benzene, Toluene, Ethyl Benzene, Xylene ("BTEX") vapors originating from within the fence line of the ConocoPhillips Refinery for the five year time period (from 1988–1992) that plaintiff was living near the Refinery. As he explained, "[t]o perform the model, I input certain factors, including a benzene emission rate, an emission point, and historical meteorological data, which were then used the calculate the dispersion

**6.** *Plaintiff has asserted negligence, negligence per se and strict liability claims against defendants.*

**7.** *When considering these* Daubert *motions the court has assumed, but not decided, general causation (that benzene can cause AML (inv16).* Henricksen v. ConocoPhillips Co., *605 F.Supp.2d 1142, 1156 (E.D. Wash. 2009) ("In determining whether an alleged chemical exposure caused a particular disease or illness, an expert must establish the following criteria: (1) the toxic substance at issue must have been demonstrated to cause in humans the disease or illness suffered by the plaintiff; (2) the individual must have been exposed to a sufficient amount of the substance in question to elicit the health effect in question; (3) the*

*chronological relationship between exposure and effect must be biologically plausible; and (4) the likelihood that the chemical caused the disease or illness in an individual should be considered in the context of other known causes."); see generally* Hollander v. Sandoz Pharms. Corp., *289 F.3d 1193, 1211 (10th Cir. 2002) (plaintiffs' experts needed to present reliable evidence that the drug could cause strokes, in order to "rule in" the drug "as a scientifically plausible cause' of the plaintiff's stroke).*

**8.** *Fugitive emissions were described by Dr. Mitchell as including, but not limited to "tank farm floating roof storage emissions, loading/unloading operations, process drains, cooling towers, spills and leaks." Doc. # 95–3, p. 4.*

plume across the grid. Doc. # 111–1, p. 3, ¶ 9.

Based on the results of his modeling, Dr. Mitchell concluded that, during the period 1988 through 2004,[9] (1) "[t]]he maximum 1–Hour concentration associated with a stack release of V.OCs is 119 micrograms per cubic meter (or 0.0367 ppm)" and (2) "[t]he maximum 1–Hour concentration associated with a fugitive release of benzene vapors into the atmosphere is 152,728 micrograms per cubic meter (or 47 ppm.)."[10] Doc. # 95–3, p. 26. He did not offer an opinion regarding plaintiff's dose or cumulative exposure to benzene.[11]

Defendants claim that the methodology Dr. Mitchell used in this case is unreliable. They also argue that, while he lacked the qualifications to render an opinion as to plaintiff's cumulative benzene exposure, he essentially made that determination by providing insufficient data to Dr. Gore— modeling estimates for maximum concentrations for periods of one hour or less— and by telling Dr. Gore which figure to use—the peak hourly concentration level— when determining plaintiff's dose or total benzene exposure. Dose or cumulative exposure is calculated by multiplying benzene concentration or exposure level by time, the period or duration of exposure.

*See* Doc. # 154, p. 149. In light of other conclusions reached here, it is unnecessary to definitively resolve all of defendants' objections or to evaluate the impact of them on various aspects of the methodology Dr. Mitchell uses to come up with the critical number that Dr. Gore relied on to determine plaintiff's benzene dose. Nonetheless, they point out several significant problems underlying his opinions, that will be discussed.

Defendants' initially criticize Dr. Mitchell's use of AERMOD, contending that an air quality model which is used to determine compliance with air quality standards and other regulatory requirements is not an appropriate tool for estimating an individual's actual exposure to contaminants in the air.[12] However it appears that Dr. Mitchell used an appropriate model[13] but failed to follow certain technical guidelines federal and state agencies provide to ensure the accuracy of AERMOD studies. *See* Doc, # 95–6, p. 4, ¶ 6.

The accuracy of the predictions of AERMOD and similar models depends on the release parameters of the emissions sources, including stack height, exit gas velocity and exit gas temperature. Doc. # 95–6, pp. 3–4, ¶ 5. Yet Dr. Mitchell's modeling approach assumed that 100% of the Refinery's stack and fugitive emissions came from single locations.[14] While he was

9. *Dr. Mitchell notes in his report that plaintiff was born in Ponca City in 1988 and lived "near to and around the Plant facility for numerous years covering the period 1988 through 2004." Doc. # 95–3, p. 26.*

10. *Dr. Mitchell also calculated concentrations for shorter exposure periods. See Doc. # 95–3, pp. 24–25, Tables 1a, 1b, 2a, 2b. Doc. # 95–3, p. 26. However, the hourly rate for fugitive emissions is the critical figure in the litigation. It was used to calculate plaintiff's dose because it was higher than the hourly rate for stack emissions.*

11. *Dr. Mitchell later did prepare what defendants considered to be dose calculations, a few weeks before the Daubert hearing. See Doc. # 154, p. 145–53.*

12. *See United States Environmental Protection Agency, Technology Transfer Network Support Center for Regulatory Atmospheric Modeling, http://www.epa.gov/ttn/scram/dispersionindex. htm (last visited March 7, 2017) (explaining dispersion modeling and the purposes for air quality models).*

13. *Defendants' own expert stated that the problem was not with the model Dr. Mitchell used, but his implementation. Doc. # 95–6, p. 20.*

14. *In support of his conclusion that Dr. Mitchell's approach of using a point source for his model was "indefensible," defense expert Bart M. Eklund describes the physical layout of the Refinery:*

 *The Ponca City Refinery covers about 2,500 acres (3.9 square miles) and processes a mix-*

aware that the various stack sources at the Refinery vary greatly with respect to these parameters, he did not explain his methodology for combining stacks and his merging was not in the manner suggested by the United States Environmental Protection Agency ("USEPA").[15] Initially he could not identify any regulatory guidance or peer reviewed literature supporting his decision to combine stacks into a single emission source, claiming it was "common knowledge from modelers," and that "we're not running a regulatory model in my report." [16] Doc. # 95–1, p. 11.

Similar problems exist with the design of Dr. Mitchell's single source fugitive emissions model. Even though he acknowledged that fugitive emissions at the Refinery come from multiple sources, at different heights and locations, Doc. # 95–1, p. 12,[17] he placed the emissions point near the Refinery's tank farms at ground level, which he justified on the basis that that was where unreported spills occurred. Dr. Mitchell acknowledged that his placement of the fugitive emissions sources was arbitrary. Doc. # 95–1, pp. 39, 41. He had no information about any specific spills that had occurred, id., at pp. 29–30, and he could not cite to any regulatory documents or peer-reviewed literature that supported his modeling method. Dr. Mitchell later cited an EPA proposed rule/risk assessment study [18] that had used a point source model and a related September 2015 EPA report regarding hazardous air emissions from petroleum refineries (EPA September 2015 Report). Based apparently on information provided by Dr. Ede both that the EPA has recognized that ground level is where 85% of fugitive emissions occur and that approximately 42% of the Refinery's benzene emissions come from defendants' wastewater emissions, Dr. Mitchell

---

ture of light, medium, and heavy crude oils. According to the State of Oklahoma's Draft/Proposed Air Permit 1 dated June 20, 2014, the facility is divided into six main areas based on the physical layout of operations: East Plant, West Plant, North Plant, South Plant, Coker Combo/Alky, and Oil Movements. The Air Permit (at page 64) lists stack parameters for 42 point sources that were each included in previous modeling submittals. The Air Permit (at page 85) enumerates the number of potential fugitive emission sources as follows: 239,419 connectors/flanges; 24,464 gas valves; 27,944 light liquid valves; and 17,220 heavy liquid valves. In addition, there are over 2,000 process drains, at least 12 cooling towers, and more than 150 tanks and other storage vessels. Past modeling studies have combined localized groups of fugitive sources (as area sources) to make the modeling effort manageable, while still providing defensible model predictions of potential air impacts for off-site locations.
Doc. # 95–6, pp. 2–3, ¶ 3.

**15.** Merging is permitted if "parameters [are] within 20% of one another for sources within 100m of one another." Doc. # 95–6, p. 4, ¶ 5; p. 21.

**16.** In her response brief plaintiffs focus primarily on Dr. Mitchell's opinion on fugitive emissions because the results of his model showed a higher benzene level for them than for stack emissions. Nonetheless, with respect to defendants' challenge to Dr. Mitchell's decision to use a one point source model plaintiff offers no explanation other than that "combining stacks in a model is appropriate. To the extent Defendants wish to attack that approach, the proper way of doing it is at trial." Doc. # 111, p. 14.

**17.** See 95–6, p. 3, ¶ 3 ("The Air Permit ... enumerates the number of potential fugitive emission sources as follows: 239,419 connectors/flanges; 24,464 gas valves; 27,944 light liquid valves; and 17,220 heavy liquid valves. In addition, there are over 2,000 process drains, at least 12 cooling towers, and more than 150 tanks and other storage vessels."); Doc. # 154, p. 189.

**18.** The proposed rule pertained to amendments to the national emission standards for hazardous air pollutants for petroleum refineries. 79 Fed. Reg. 36880 (June 30, 2014).

reran his model using the wastewater pond[19] as his fugitives emission point.[20] However, even if a government's agency use of a single point model in a regulatory study supports Dr. Mitchell's model choice,[21] neither it nor the declaration demonstrate that he correctly selected the single emission point. His model does not account, as defendants note, for the remaining 58% of the fugitive emissions. And there were other things the model did not address, such as the presence of a solid wall near the refinery boundary which would act as a barrier and increase the concentrations inside the plant. *See* Doc. # 154, pp. 36–37.[22]

Defendants also complain of Dr. Mitchell's failure to consider air sampling data that was available.[23] The court agrees that one might expect "a scientist advancing a model that does not conform to regulatory standards and has not been subject to peer review" to "attempt to validate his model results with real world data." Doc. # 95, p. 26.

Defendant's other principal criticism with respect to Dr. Mitchell is that, because he modeled concentrations during specific short-term intervals, he did not provide information from which plaintiff's dose could reliably be calculated. They claim that the proper measure, if modeling is performed, is the average annual benzene concentration, *see* Doc. # 95–5, p. 33, and that Dr. Mitchell compounded the error by telling Dr. Gore which concentration level to use in his computations.

Mitchell testified that he did not do exposure assessment, stating: "That's for a toxicologist to do." Doc. # 95–1, p. 36. His

---

19. *During the Daubert hearing Dr. Mitchell testified, citing a September 2015 EPA report, that wastewater treatment was only a 12% source of fugitive benzene emissions. Doc. # 154, p. 128.*

20. *In his Declaration Dr. Mitchell also notes that he had assumed for purposes of his model that the fugitive emission point was at ground level. He states that the EPA has recognized that ground level is where 85% of fugitive emissions occur, citing the June 2014 EPA proposed rule/risk assessment study. Dr. Mitchell apparently also obtained that information from Dr. Ede, after he conducted his analysis. See Doc. # 116–31, p. 2.*

21. *Not only did Dr. Mitchell testify that he was not "running a regulatory model in [his] report." Doc. # 95–1, p. 11, plaintiff never satisfactorily responded to defendants' argument that the type of study conducted by the EPA in conjunction with its proposed rule—a screening level study—was inappropriate in an exposure assessment case like this. See Doc. # 154, pp. 33–34.*

22. *The model also failed to address the effect of the terrain on the "pollutant transport," Doc. # 95–6, p. 24, though as Dr. Mitchell testified, the Refinery is not in a mountainous region.*

*Doc. # 154, p. 126. While as plaintiff asserts, some of these issues can be attacked through cross-examination, when there are too many, the question becomes whether the export's testimony is "reliable" for purpose of Rule 702.*

23. *Other problems existed with Dr. Mitchell's initial report, including that the reported concentrations included in Tables 1a, 1b, 2a, and 2b are for locations inside the walls of the Refinery, not where plaintiff lived or played. The location for the maximum one hour fugitive benzene concentration from Dr. Mitchell's model was next to the emissions source—the hypothetical pool of benzene and it occurred on a date before plaintiff was born. See Doc. Nos. 95–1, p. 18; 95–5, pp. 4–5 ¶ 8. It was not until Dr. Mitchell prepared his supplemental declaration that he reported the exposure concentrations at the addresses where plaintiff actually resided. See Doc. Nos. 111–1, pp. 7–8; 154, pp. 169–70. In her response brief plaintiff acknowledged that the "model output maximum concentrations and that those maximum concentrations were within the Refinery," but that "Plaintiff did not—and does not intend to—use those concentrations in the case." Doc. # 111, p. 15. The fact that Dr. Mitchell reported concentrations which plaintiff does not intend to use, and did not report those which were relevant, undercuts the reliability of his expert report.*

role was to provide the benzene concentrations and Dr. Gore would then calculate the dose. However, as defendants point out, Dr. Mitchell essentially attempted to perform Dr. Gore's function by determining "what data [was] most relevant for the purposes of exposure assessment." Doc. # 95, p. 12. He stated in his report that he calculated "[b]oth short term (1–Hour, 4–Hour, 8–Hour, 24–Hour) and long term (monthly and annual) exposure levels for VOCs released into the air" from defendants' refinery, Doc. # 95–3, p. 10, but the only opinions he states pertain to "[v]arying short term exposure periods" of one hour and less. *Id.* at p. 26. Dr. Mitchell testified during the Daubert hearing: "So I gave Dr. Gore my—in fact, I gave him a whole set, I gave him one hour, four hours, eight hours, 24 hours. If he has another reason to choose a different model, that's up to his expertise." Doc. # 154, p. 178. Yet, Dr. Mitchell then admitted that he "told Dr. Gore you use a one-hour figure because that represents the concentration for the acute exposure." *Id.*

At one point during the Daubert hearing, Dr. Mitchell testified that he was qualified to tell Dr. Gore to use the one hour figure because he has "modeled many cases working with many toxicologists and many industrial hygienists that have used [his] data, and what they request is one-hour data." [24] *Id.* at p. 179. He also stated that "the EPA studies, when they're doing their studies of refineries and risks, [they] use the one-hour data." *Id.* The obvious flaw in Dr. Mitchell's reasoning is that in those other cases it was the toxicologist or industrial hygienist who made the decision about which exposure rate was appropriate. What other plaintiffs' experts may

have asked Dr. Mitchell to model in other lawsuits is not a reliable basis for his testimony in this case that the peak hourly rate is the appropriate number to use.

As for his reference to EPA studies, Dr. Mitchell relied heavily during his testimony on a report done by the EPA in 2015 in conjunction with the Clean Air Act's regulatory process for addressing emissions of hazardous air pollutants from petroleum refineries.[25] He did not, though, explain why the parameters used by the EPA in the study it conducted in conjunction with that report or in its other screening studies are appropriate when attempting, as in this case, to determine an individual's level of exposure in a toxic tort case. Dr. Eklund drew a distinction between screening level and refined studies, stating that "a screening –level study says, here's the highest a number could be." Doc. # 154, p. 237. As stated by the court in Bd. of Cty. Comm'rs of Cty. of La Plata, Colorado v. Brown Grp. Retail, Inc., 768 F.Supp.2d 1092, 1105 (D. Colo. 2011), an environmental contamination case brought under the Resource, Conservation and Recovery Act and the Comprehensive Environmental Response, Compensation, and Liability Act, "Regulatory screening levels, action levels, and standards do not identify real or actual risks to human health. Rather, these regulations are designed to protect the public health by identifying the level of chemical exposure at which there is no threat of harm with a large margin of error. Exceedance of regulatory screening levels, action levels, or standards therefore does not demonstrate a real or actual risk to human health." [26] *See* Coleman v. Union Carbide Corp., 2013 WL 5461855, at *24 (S.D.W.Va. Sept. 30, 2013); *see generally*

---

24. *At another point during the Daubert hearing Dr. Mitchell stated that he fully agreed that he was not qualified to offer an opinion "when it [came] to analyzing what value—acute, chronic, subchronic—is more relevant for assessing human health risk for benzene or any other chemical," because he is an air modeler and a meteorologist." Doc. # 154, p. 175.*

25. *The study, while discussed at the hearing, was not introduced as an exhibit.*

26. *Dr. Mitchell did not refer to the September 2015 EPA Report in either his Expert Report or his Declaration or apparently during his deposition. While it might be permissible for Dr. Mitchell to cite the report as additional support*

Allen v. Pa. Eng'g Corp., 102 F.3d 194, 199 (5th Cir. 1996) ("Regulatory and advisory bodies such as IARC, OSHA and EPA utilize a 'weight of the evidence' method to assess the carcinogenicity of various substances in human beings and suggest or make prophylactic rules governing human exposure. This methodology results from the preventive perspective that the agencies adopt in order to reduce public exposure to harmful substances."). Dr. Eklund also noted that, contrary to what plaintiff was asserting with respect to the study discussed in the EPA 2015 September Report, chronic concentrations were calculated as the annual average of hourly concentrations. The EPA did not use the peak one-hour concentration or the "maximum hourly for the annual average." Doc. # 155, p. 205.

The court is not persuaded that determining plaintiff's dose is merely a matter of "just multiplying two numbers together," Doc. # 154, p. 149, or that Dr. Mitchell is qualified to express an opinion as to plaintiff's cumulative exposure to benzene, or as to whether the highest hourly concentration should be the basis for Dr. Gore's dose analysis. As will be explained, that conclusion undermines Dr. Gore's dose opinion. Because the court concludes the testimony of both Drs. Gore and Calvey should be excluded, plaintiff will not be able to establish specific causation. The court therefore does not have to resolve defendants' motion as to Dr. Mitchell and decide whether the problems discussed regarding his methodology are sufficient to preclude his testimony regarding the opinions included in his original expert report.

*for his modeling method, it is questionable when it is the only authority he cites and he cites it after he conducted his study. It also is prejudicial to defendants for plaintiff to rely heavily on a study which, even though defendants participated in it, they did not have the opportunity to question Dr. Mitchell about and their experts did not have time to review.*

## Dr. Gore

Dr. Gore is a hematologist/oncologist with impressive credentials who specializes in treating cancers of the blood and lymphatic system. He is well-published, with most of his articles relating to the biology and treatment of leukemias, lymphomas and other diseases of the blood and lymphatic systems. Dr. Gore also diagnoses and treats dozens of leukemia patients each year, including many who have AML.

Plaintiffs rely on Dr. Gore to establish plaintiff's cumulative benzene exposure or benzene dose and specific causation. Dr. Gore initially determined that plaintiff's cumulative exposure to volatile organic compounds, including benzene, would be at least 1.76 ppm-year. Doc. # 94–9, pp. 7–8, ¶.11.[27] He "concluded to a reasonable degree of medical certainty that, for any person who has developed AML and has had significant environmental exposure to benzene, such exposure to benzene should be considered a substantial factor that contributed to that individual's AML." *Id.* at p. 16, ¶ 30. It was his opinion that the likelihood of benzene participating in the causation of plaintiff's leukemia "must be considered high." Defendants seek to exclude both Dr. Gore's dose assessment and his specific causation opinions.

## Dose opinion

■ As stated earlier, plaintiff's benzene dose is determined by multiplying the benzene concentration by the number of years she resided near the refinery. The main dispute is over the concentration level used in the calculation.[28] Plaintiff argues

**27.** *In his declaration Dr. Gore updated his calculations based on Dr. Mitchell's revised rates after Dr. Mitchell reran his models.*

**28.** *The parties also disagree, among other things, as to whether Dr. Mitchell modeled VOC or benzene emissions.*

an acute standard should be used. Dr. Gore took the highest hourly concentration of benzene from Dr. Mitchell's report, in other words, the highest one hour concentration level that was reached in five years or the highest hour out of 43,800 one-hour time periods to use in his calculations. Defendants argue that a chronic standard should be used. They claim the annual average concentration level is the appropriate number to use when determining plaintiff's alleged benzene dose. Defendants' expert calculated plaintiff's cumulative benzene exposure in ppm-years by "multiplying the exposure duration (years) by the average daily airborne concentration (ppm)." Doc. # 96–3, pp. 7–8, ¶ 14.

Defendants contend that Dr. Gore was "outside his discipline" and made fatal mistakes when calculating plaintiff's benzene dose. Dr. Gore admitted not only that he had never previously calculated anyone's cumulative exposure to benzene, Doc. # 155, p. 153, but that he did not believe that he "calculated the dose of benzene," because he "relied on expert reports, which estimated the exposure to benzene." Doc. # 96–1, p. 38. He stated that he "merely added up what was in the expert reports." *Id.* His task, however, was to determine plaintiff's dose and that entailed not just doing the calculations, but deciding which numbers to multiply. It is undisputed, though, that he did not select the peak one-hour benzene concentration, but used it because Dr. Mitchell told him it was the most appropriate.

Plaintiff contends that Dr. Gore could rely on Dr. Mitchell's opinion data. The court agrees that, while he might be able to depend on the concentration levels Dr. Mitchell provided, he could not have Dr.

Mitchell select for him which concentration level to use to calculate dose. The concentration is a critical component of the cumulative exposure equation, not merely a modeling decision. The determination must be made by an expert, someone who can explain why the highest hour out of five years of modeled data, rather than the average hour, is used to determine an individual's long term exposure. The court has concluded that Dr. Mitchell was not qualified to decide that the one hour maximum concentration should be selected. Dr. Gore did not independently choose the peak hourly concentration, but was assured by Dr. Mitchell that it "was the metric that was used in the industry." He stated that it was "[Dr. Mitchell's] area of expertise, not [his]." Doc. # 155, p. 127.[29]

Multiple other errors associated with Dr. Gore's expert report and declaration further demonstrate the unreliability of his testimony regarding plaintiff's dose in this case. Dr. Gore states in his declaration and plaintiff asserts in her <u>Daubert</u> response, that he calculated plaintiff's dose by "assum[ing] exposure to benzene in ppm-years, which equates to exposure for 8 hours a day, 5 days a week, 50 weeks a year, for a total of 2,000 hours per year" (the industrial worker's standard). Doc. # 113–3, p. 5, ¶ 17. However, during the <u>Daubert</u> hearing he testified he had been mistaken, that plaintiff's dose was determined by taking the "[p]eak one-hour exposure" and assuming plaintiff was exposed to it one hour daily for each year of exposure, obviously a significant difference. *See* Doc. # 155, pp. 123, 164–65. Dr. Gore also used the wrong number of years for the duration component of the dose calculation, eight rather than four. *See*

---

**29.** *Dr. Gore testified that he was reassured by reading the EPA September 2015 Report which explained why it was "important to use the highest peak hour as the measurement." Doc. # 155, p. 128. However, the reference in the* document to "peak" related to modeling inputs—emission levels, not the concentration levels used to determine chronic exposure. See Doc. # 155, p. 205.

Doc. Nos. # 154, pp. 75–76; 155, pp. 123, 147–50.[30]

Dr. Gore's caused considerable confusion during his deposition because, in his expert report he stated an opinion regarding plaintiff's asserted VOC dose, rather than her benzene dose. He declared in his report "[b]ased on these numbers alone, Ms. Hall's cumulative exposure to volative organic compounds, including benzene, would be at least 1.76 ppm-year." Doc. # 94–9, p. 8, ¶ 11. At his deposition Dr. Gore reduced that figure by 20%, allegedly to determine plaintiff's benzene dose, which he testified was .3 ppm years. He later claimed he had been misled by defense counsel, stating in his supplemental declaration that he had subsequently learned that "Defense counsel misunderstood Dr. Mitchell's air modeling." Doc. # 113–3, p. 12, ¶ 32. Plaintiff and Dr. Gore's position was that Dr. Mitchell had modeled benzene, not VOC that included benzene, so the 1.76 figure should not have been reduced. Any misunderstanding was based on the terminology used both by Dr. Gore and Dr. Mitchell in their export reports.

As demonstrated by his deferral to Dr. Mitchell on a critical matter underlying his dose calculation and the flaws in both his expert report and declaration, Dr. Gore's dose calculation does not satisfy the reliability standards established by Daubert. He will not be permitted to offer an opinion as to plaintiff's dose or cumulative benzene exposure.

Specific Causation opinion

 The remaining issue is whether the lack of testimony as to plaintiff's dose precludes Dr. Gore's opinion that benzene specifically caused plaintiff's AML. Plaintiff argues that it does not, contending that there "is no dose-response requirement in

Oklahoma," and that Dr. Gore also relied upon a differential diagnosis methodology in reaching his conclusions, which "is sufficient to survive Daubert." Doc. # 113, p. 12. The Tenth Circuit has recognized that differential diagnosis, a common medical diagnostic technique, is in some circumstances "a valid scientific technique to establish causation." Bitler, 400 F.3d at 1236. When employed by a physician, "differential diagnosis refers to the process by which a physician 'rules in' all scientifically plausible causes of the plaintiff's injury ... [and] then 'rules out' the least plausible causes of injury until the most likely cause remains." Hollander v. Sandoz Pharms. Corp., 289 F.3d 1193, 1209 (10th Cir. 2002) (internal quotation marks omitted). As explained by the Tenth Circuit, "the inference to the best explanation [for the disease] must first be in the range of possible causes; there must be some independent evidence that the cause identified is of the type that could have been the cause." Bitler, 400 F.3d at 1237.

Defendants assert that dose is required for plaintiff to prove her claims and that Dr. Gore's differential diagnosis is unreliable because he fails to rule in benzene or rule out other possible causes of plaintiff's AML. Plaintiff acknowledges that she has to show that she was "exposed to a sufficient amount of the substance in question to elicit the health effect at issue." Doc. # 113, p. 10 (quoting Watson v. Dillon Cos., Inc., 797 F.Supp.2d 1138, 1150 (D.Colo. 2011)). Dr. Gore's own opinion was that, for benzene to be a substantial contributing factor to an individual's development of AML, that individual must have had "significant environmental exposure to benzene." Doc. # 94–9, p. 16, ¶ 30. As plaintiff asserts, causation can be proved

30. *Dr. Gore testified that he believed he relied on another expert's report for his exposure duration information. Although that report reflects a duration just short of five years, the* expert, Dr. J. Berton Fisher, testified at the *Daubert hearing that plaintiff's exposure period was four years. See Doc. # 154, pp. 75–76.*

either with exposure data or circumstantial evidence. The problem is the court has already excluded her exposure data and it is clear from the cases she cites, Holstine v. Texaco, 2001 WL 605137 (Okla. Dist. Ct. Apr. 16, 2001) and Christian v. Gray, 65 P.3d 591 (Okla. 2003), that the type of circumstantial evidence that is sufficient to demonstrate exposure in the absence of specific quantitative measure has not been offered here.

Holstine involved the death of a mechanic from AML. The decedent worked with benzene and benzene-containing solvents and his heirs sued the companies which had manufactured and sold the benzene products to his employer. The defendants in Holstine argued that the plaintiffs' experts had to be excluded unless they could prove the decedent's exposure "with specific quantitative measurements." Id. at *2. The trial court disagreed. While proof of "long term high level exposure to benzene" had to be "shown in some manner before the benzene/AML link [could] be admitted," id. the court concluded that the showing could be made "either quantitatively or circumstantially." Id. Circumstantial proof could include "worksite anecdotal evidence of overpowering odors of benzene or fume clouds of benzene which would support the theory that Mr. Holstine had high level exposure." Id. Similarly, in Christian the Oklahoma Supreme Court stated that "[a] plaintiff may testify that he or she was overcome by gas or fumes that are felt, seen, or smelled by the plaintiff." Christian, 65 P.3d at 606. There has been no evidence that plaintiff personally experienced anything similar here which would demonstrate that she had "long term high level exposure." Holstine, 2001 WL 605137, at *2. See Henricksen v. ConocoPhillips Co., 605 F.Supp.2d 1142, 1161 (E.D. Wash. 2009) ("Though proof of [plaintiff's] benzene exposure through specific quantitative measurement is not a requirement, exposure at some level must be shown before a link between benzene exposure and AML could be drawn.").

The court in Holstine determined that, in the absence of any evidence—either quantitative or circumstantial—that the decedent had been exposed to high levels of benzene over a long period, the plaintiffs could not rely on the differential diagnosis of their expert to establish causation. Holstine, 2001 WL 605137, at *3. Here, too, before Dr. Gore can perform a differential diagnosis and offer an opinion that defendants' benzene caused plaintiff's AML by ruling out other potential causes, plaintiff must first demonstrate that benzene is a potential cause. She has not, though, offered circumstantial evidence of exposure and the court previously concluded her quantitative evidence is inadmissible.

 Other problems exist with Dr. Gore's differential diagnosis that might lead the court to question its admissibility due to reliability concerns, even if there were sufficient evidence of exposure. While a court "can admit a differential diagnosis that it concludes is reliable if general causation has been established," Goebel v. Denver & Rio Grande W. R. Co., 346 F.3d 987, 999 (10th Cir. 2003), the expert must adequately consider and rule out alternative explanations. Here Dr. Gore discounted plaintiff's smoking as a potential cause of her AML both after an apparently inadequate investigation of the extent she smoked, see Doc. No. 96–1, pp. 8–10, and after he testified that he would consider smoking a probable cause, though her smoking history was limited. Id. at p. 68. He also did not consider "idiopathic causes [for plaintiff's AML], additionally rendering his differential diagnosis unreliable." [31]

---

31. Plaintiff's expert, Dr. Martyn T. Smith, testified that between 70 and 75 percent of AMLs do not have an identifiable or explicable cause. Doc. # 99–1, p. 6.

Chapman v. Procter & Gamble Distrib., LLC, 766 F.3d 1296, 1311 (11th Cir. 2014). Although idiopathic or de novo is not a cause, per se, courts have repeatedly faulted experts for their failure to consider idiopathic or unknown causes for diseases when rendering their differential diagnoses. See Milward v. Rust–Oleum Corp., 820 F.3d 469, 475–76 (1st Cir. 2016); Chapman, 766 F.3d at 1311; Henricksen, 605 F.Supp.2d at 1162 ("Here, Gardner (and all of Plaintiffs experts, for that matter) fail to exclude-much less address in their reports-the likelihood that [plaintiff's] AML had no known cause. The affidavits of Pyatt and Natelson are unrebutted as to the fact that 80–90% of all cases of AML are idiopathic, having no known cause. Faced with similar situations, other courts have excluded experts' differential diagnoses where they failed to adequately account for the likelihood that the disease was caused by an unknown factor.").

Dr. Gore's differential diagnosis is therefore flawed and unreliable and will be excluded.[32] Defendant's Daubert motion seeking to exclude the dose and specific causation opinions of Dr. Gore will be granted. Dr. Calvey

Plaintiff hired Dr. Calvey to offer opinions as to both general and specific causation. Dr. Calvey has a Ph.D. in environmental epidemiology and, since 2005, has owned an environmental consulting firm which specializes in property redevelopment and environmental restoration. She previously worked for the Oklahoma Department of Environmental Quality ("DEQ") in its waste management division and later served as staff epidemiologist and as the environmental programs manager in the Department's land protection division. Dr. Calvey offers the opinions that epidemiological research shows that exposure to benzene is correlated with development of acute myelogenous leukemia (AML); that AML with an inversion of chromosome 16 is associated with benzene exposure and that AML "in Ms. Hall's circumstances is most likely caused by her expose to benzene releases in her immediate environment during childhood." Doc # 94–26.

General Causation

■ Although listed to testify that benzene can cause AML inv(16), Dr. Calvey admitted during the Daubert hearing that she had not searched for peer-reviewed literature linking AML inv(16) with benzene. She stated that she did not because she "was looking at AML in particular, and most of the studies mention only AML." Doc. # 166, p. 121.[33] The court agrees with defendants that, at least in this case, that is a sufficient basis to preclude Dr. Calvey from offering an opinion on general causation. Contrary to what plaintiff asserts in her brief, defendants are not disputing Dr. Calvey's findings that benzene can cause AML, but rather her finding that it can cause AML inv(16). Because she did not acknowledge, account for, or even search for evidence in the relevant scientific literature which refutes her theory, Dr. Calvey's expert opinion on general causation is unreliable. See Norris, 397 F.3d at 885 (court upheld exclusion of expert testimo-

32. In addition, although the court found Dr. Gore generally to be a credible witness, it found troubling that he testified just a few years previously in federal court that it would be lying to state that benzene caused leukemia with an inversion of Chromosome 16. Doc. # 155, pp. 175–76. Dr. Gore admitted there has been no peer-reviewed epidemiological literature in the last two years showing a statistically significant increased risk for Inversion 16 from benzene exposure. Id. at p.176.

33. The study plaintiff cites in her response brief as being one Dr. Calvey could not identify by name does not, defendants assert, refer to the chromosome abnormality inv(16) or any subtype of AML. See Doc. # 97–7(Stenehjem Article).

ny that "completely ignored the many epidemiological studies that do not find a link between silicone gel breast implants and any systemic disease" and rather "stated that epidemiological studies relied on by the industry 'are not definitive.'"). Plaintiff's argument that Dr. Calvey's causation opinion is "based on reliable review of relevant epidemiological studies" is simply contrary to Dr. Calvey's sworn testimony. Plaintiff's argument that Dr. Calvey was at one time the State's expert on benzene, which gave her "a unique expertise in benzene exposure, and in the technical details relevant to [defendants' Refinery], Doc. # 112, p. 16, does not provide Dr. Calvey with the qualifications necessary to state an opinion as to whether benzene can cause AMT inv(16). Notably, in her attempt to bolster Dr. Calvey's general causation opinion, plaintiff quotes extensively from the Declaration of Dr. Martyn T. Smith, plaintiff's toxicology expert.

Due to Dr. Calvey's lack of qualifications and the unreliability of her report insofar as it pertains to the issue of general causation, Dr. Calvey will not be allowed to express an opinion that benzene causes AML inv(16).

Specific Causation

■ Defendants challenge the methodology underlying Dr. Calvey's opinion that plaintiff's AML was caused by benzene emitted from their refinery on the ground that, while she engaged in a differential diagnosis, she failed to adequately research the various risk factors for AML and then failed to reliably rule out reasonable alternative causes of the disease. They also assert that, before a link between benzene exposure and AML can be drawn, exposure must be shown and that is lacking in Dr. Calvey's report. She fails, they contend, to mention plaintiff's benzene dose anywhere in her report. To the extent that Dr. Calvey relies on plaintiff's asserted exposure to benzene while she

was in utero and during the first few years of her life, defendants contend that Dr. Caley admitted she had no information about plaintiff's mother while plaintiff was in utero and disregarded reliable evidence regarding plaintiff's asserted exposure while a toddler. She also lacked, defendants claim, basic information, both about plaintiff's in utero experience and whether unborn children can metabolize benzene, needed to support her theory.

Plaintiff responds that Dr. Calvey properly ruled in benzene as a cause of plaintiff's AML based on "actual measurements of high concentrations of benzene in the neighborhood in which Ms. Hall lived, which provides a useful, albeit *qualitative,* approach to determine whether Defendants' emissions likely caused [plaintiff's] leukemia." Doc. # 112, p. 23. She asserts that Dr. Calvey considered and, "after analyzing all available information," rejected plaintiff's tobacco use as the likely cause of plaintiff's AML and similarly considered and rejected her obesity as a cause of her disease. *Id.* at p. 27. Dr. Calvey's opinions regarding plaintiff's in utero and childhood exposures are based, plaintiff argues on a "holistic, weight-of evidence approach." *Id.* at p. 28.

■ A lengthy discussion regarding Dr. Calvey's specific causation opinions is not warranted. Dr. Calvey's career shifted in focus when she left her position at the Department of Environmental Quality and in 2005 formed an environmental consulting firm that specializes in the redevelopment and reuse of property. As a result, for her to conduct a differential diagnosis and conclude that benzene exposure specifically caused plaintiff's AML, she first would have had to engage in sufficient research to familiarize herself with the different risk factors for AML to then exclude them as possible causes for the disease. As evidenced by her deposition

testimony, Dr. Calvey did not perform the necessary background steps to support her opinions. Because she failed to adequately research the various risk factors for AML, including obesity and smoking, *see e.g.,* Doc. # 97–1, pp. 33, 39 (admitting that while she had "looked over a period of years at different types of diseases associated with cigarette smoking," "I haven't looked in the last two years."); Doc. # 166, pp. 130–31 (admitting she did not look to see if obesity could cause AML); pp. 133–34. Dr. Calvey did not reliably rule in and then rule out other potential causes of plaintiff's AML.[34] "An expert's failure to enumerate a comprehensive list of alternative causes and to eliminate those potential causes determines the admissibility of proposed specific-causation testimony." Chapman v. Procter & Gamble Distributing, LLC, 766 F.3d 1296, 1310 (11th Cir. 2014). *See* Bitler, 400 F.3d at 1237 ("Experts must provide objective reasons for eliminating alternative causes when employing a 'differential analysis.'").

Dr. Calvey also did not did not adequately address the issue of exposure in her report. Regardless of whether the approach is "qualitative" or "quantitative," the cases require the plaintiff to prove that she was actually exposed to the toxic substance before she may recover. Mitchell v. Gencorp Inc., 165 F.3d 778, 781 (10th Cir. 1999); Holstine, 2001 WL 605137. Dr. Calvey relied on groundwater samples taken before plaintiff was born, and from a house where plaintiff did not live, see Doc. # 112, p. 24 (citing Doc. 112–13), yet did not consider air measurements taken the year plaintiff was born from the homes inside plaintiff's neighborhood. Doc. # 97–1, pp 10–11. Concrete evidence is needed to demonstrate exposure, not statements such as "[r]esults from both Conoco and DEQ document benzene releases in shallow groundwater that could have caused vapor intrusion into [plaintiff's] home," or the runoff in a ditch in plaintiff's neighborhood, which came from the Refinery, "sometimes contained elevated levels of benzene." Doc. # 94–26, pp. 8, 12.[35]

Finally, to the extent Dr. Calvey bases her specific causation opinion on plaintiff's in utero and early childhood exposures, the court concludes Dr. Calvey's statement in her report that "exposure in utero and in early life may result in cancers later in life," *id.* at p. 10, is not sufficiently non-speculative for it to be of assistance to the jury.[36] It also is unreliable due to her lack of familiarity with the circumstances surrounding plaintiff's in utero experience and her lack of knowledge about fetal toxicology. *See* Doc. # 97–1, pp. 16, 51, 54.

For Dr. Calvey's reasoning and methodology to be scientifically valid, there must be evidence from which a jury could infer that the plaintiff was in fact exposed to benzene from the Refinery, coupled with a consideration of reasonable alternative causes of plaintiff's AML. *See* Huerta v. BioScrip Pharmacy Servs., Inc., 429 Fed. Appx. 768, 774–76 (10th Cir. 2011); Mitch-

---

**34.** *As defendants note, Dr. Calvey also failed to adequately consider idiopathic causes for plaintiff's AML.*

**35.** *When asked to state plaintiff's cumulative exposure to benzene, Dr. Calvey responded, "[S]he was exposed in the home and outside the home that backed up to the refinery in the first two years of her life and she was exposed by being in the neighborhood, playing in the water, playing in the ditches, things like that when she was a little bit older. And I would*

*say that was probably two or three years but I don't remember exactly. The critical time for being exposed is in-utero and as a very young child." Doc. # 97–1, p. 15. If, however, her principal exposure was while she was two and under, she obviously would not have been playing in the water and ditches.*

**36.** *Dr. Calvey testified that she did not know how much benzene plaintiff was exposed to in utero and the first two years of her life. See. Doc. # 166, p. 144.*

**1194**

ell, 165 F.3d 778, 781 (10th Cir. 1999). The absence of such evidence coupled with the faulty differential analysis conducted by Dr. Calvey precludes the admission of her expert testimony. Defendants' Daubert motion as to Dr. Calvey will be granted and her general and specific causation opinions will be excluded.

### Conclusion

The court has concluded that the specific causation opinion of Dr. Gore and the general and specific causation opinions of Dr. Calvey are sufficiently unreliable under Daubert that they must be excluded. Defendants' motion to exclude Dr. Gore [Doc. # 96] and Dr. Calvey [Doc. # 97] are granted. Without the testimony of Drs. Gore and Calvey, plaintiff cannot establish the causation element of her negligence, negligence pro se and strict liability claims. It is therefore unnecessary to determine whether, or the degree to which, Dr. Mitchell's testimony should also be excluded.

**IT IS SO ORDERED.**